**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1)  GINA M. NELSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-594-JHP |
| | ) | |
| (1)  AETNA LIFE INSURANCE COMPANY, a corporation; and | ) | |
| | ) | |
| (2)  BANK OF AMERICA GROUP BENEFITS PROGRAM, an ERISA Employee Welfare Benefit Plan, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER[1]

Before the Court in this ERISA matter[2] are Plaintiff's Opening Brief,[3] Defendants' Opening Brief,[4] Plaintiff's Response Brief,[5] Defendants' Response Brief,[6] and Defendants' Reply in Support of Claim Denial Under ERISA.[7]  For the reasons cited below, Defendant Aetna

---

[1]    Page references to party briefs within this Opinion and Order use the CM/ECF file stamp pagination, rather than party pagination.

[2]    The parties have stipulated "[t]his matter is governed by ERISA." See Joint status Report at 2, Docket No. 12.

[3]    Docket No. 41.

[4]    Docket No. 42.

[5]    Docket No. 46.

[6]    Docket No. 45.

[7]    Docket No. 47.  Plaintiff's Reply Brief was stricken by Order of the Court dated September 23, 2011.  See Docket No. 51.  Defendants moved to strike Plaintiff's Reply on the basis that Plaintiff sought in her Reply to inject into the Court's review matters that are outside the scope of the administrative record before Aetna when it considered Plaintiff's claims disability benefits, which is impermissible in an ERISA case where the administrator's decision is subject to review under the arbitrary and capricious standard.  See Dkt. No. 50.  The Motion to Strike

*(continued)*

Life Insurance Company's ("Aetna") determination of benefits regarding Plaintiff's claims is **AFFIRMED**.

## BACKGROUND

### A.    Factual Background

Plaintiff Gina Nelson ("Plaintiff") was employed by Bank of America.  Bank of America provides certain benefits, including short term disability ("STD") and long term disability ("LTD") benefits, to eligible employees through the Bank of America Group Benefits Program (the "Plan").  The Plan is an "employee welfare benefit plan" as that term is defined under ERISA.  Aetna/Nelson 1551. [8]

The plan administrator of the Plan is the Bank of America Corporation Corporate Benefits Committee.  See id.  The Plan benefits are explained in the Associate Handbook, which serves as the summary plan description ("SPD") under ERISA.  Id. at 1497-1580; 1849-1860.  Bank of America retains the discretion to interpret the terms of the Associate Handbook.  Id. at 1528.  Bank of America has delegated to Aetna, as the claims administrator of the STD Plan and the insurer of the LTD Policy, the "discretionary authority to determine eligibility for benefits and construe the terms of the applicable plan and resolve all questions relating to claims for benefits under the plan".  See id. at 1553.

---

was granted as confessed pursuant to NDOK L. Civ. R. 7.2(e).  In addition, the Court concurred that the relief sought in the Motion to Strike should be granted on the merits.  See Murphy v. Deloitte & Touche Group Ins. Plan, 619 F.3d 1151 (10th Cir. 2010) ("[W]e have frequently, consistently, and unequivocally reiterated that, 'in reviewing a plan administrator's decision under the arbitrary and capricious standard, the federal courts are limited to the administrative record.' [citations omitted].").

[8] All references are to the administrative record that was provided to the Court on August 13, 2010 and August 18, 2010.  Docket Nos. 32-36; 39.

1. <u>The STD Plan</u>

Pursuant to the Plan, Bank of America provides self-funded STD benefits to eligible employees. <u>See</u>, <u>id.</u> at 1559. The SPD provides that "[s]hort-term disability provides income protection if you are unable to work for more than seven consecutive calendar days due to illness, injury or pregnancy disability." <u>Id.</u> at 1852; <u>see also</u> <u>id.</u> at 1566. The SPD also informs Plan participants as follows:

> You are considered disabled if you meet the following requirements:
>
> ❖ Due to sickness, injury or pregnancy, you are receiving appropriate care and treatment from a licensed physician on a continuing basis.
>
> ❖ You are complying with such treatment.
>
> ❖ You are unable to perform all the material and substantial duties of your occupation.

<u>Id.</u> at 1852.

The SPD states that, once a claim for benefits has been submitted, "[y]ou and your physician will be contacted and will be required to provide medical documentation to substantiate your disability." <u>Id.</u> at 1853. The SPD also advises, "Upon the request of STD administration, an independent panel of board-certified specialists will review your claim…" <u>Id.</u>

2. <u>The LTD Plan</u>

Bank of America also provides LTD benefits under a group policy issued by Aetna to Bank of America, Group Policy No. GP-811383 (the "LTD Policy"). <u>Id.</u> at 1637. The LTD Policy provides that "[t]his Plan will pay a monthly benefit for a period of disability caused by disease or injury. There is an elimination period. (This is the length of time during a period of disability that must pass before benefits start.)" <u>Id.</u> at 1638.

The Policy Certificate defines the "elimination period" as "[t]he greater of:

❖ the first 180 days of a period of disability; and

❖ the period of time when disability benefits are payable from any short term disability benefits with the exception of any statutory disability benefits, accumulated sick time or salary continuation program sponsored by your Employer."

Id. at 1659.

The LTD Policy also provides that:

"[m]onthly benefits will be payable if a period of disability:

❖ starts while you are covered; and

❖ continues during and past the elimination period.

These benefits are payable after the elimination period ends for as long as the period of disability continues as described below."

Id. at 1639.

3.    Plaintiff's Claim for Benefits Under the STD Plan

On March 3, 2009, about the time Plaintiff's office was experiencing layoffs, Plaintiff notified her manager that she would not be returning to work due to reported stress, pain and fatigue.   Id. at 00054.   Plaintiff sought benefits under the STD Plan as of March 3, 2009, claiming that she suffered from fibromyalgia, pain, and fatigue.  Id. at 8.

Aetna, as the claims administrator of the STD plan, initially approved Plaintiff's claim for benefits from March 3, 2009 through April 3, 2009.  Id. at 1474-78.  In the letter notifying Plaintiff of the approval of her claim, Aetna noted that the information provided by Plaintiff's doctor indicated that she was expected to return to work on April 20, 2009, and advised, "It is important to understand that short-term disability benefits will not be continued beyond 04/19/2009 unless we receive and review additional medical information and you are determined to be eligible for extended short term disability benefits."  Id.

As part of its evaluation of the claim, Aetna obtained a job description of Plaintiff's position from Bank of America.  Id. at 17.  Aetna also requested medical information in support of Plaintiff's claimed disability and received office visit notes ("OVNs") from her primary care physician, Dr. Michelle Kelley, and from the doctors who saw Plaintiff at the Mayo Clinic in March 2009.  The notes from the Mayo Clinic, in particular, were very detailed and chronicled Plaintiff's medical history as well as her more recent complaints.  See id. at 1332-75.

Aetna also received an Attending Physician's Statement ("APS") and a Behavioral Health Clinician Statement completed by Dr. Kelley on April 2, 2009.  Id. at 651-54.  Dr. Kelley indicated that Plaintiff had been diagnosed with fibromyalgia, autoimmune illness and chronic fatigue, but stated that Plaintiff was expected to return to work by April 20, 2009.  Id. at 654.  In addition, the Behavioral Health Clinician Statement indicated that Plaintiff could perform "applied focus and concentration for periods of 30-50 min[utes,]" (which was the longest period provided on the form), that Plaintiff's reasoning and judgment were within normal limits, that she had no socialization issues, and that she could drive, shop and pay her own bills.  Id. at 653-54.  Aetna also received some OVNs, which showed that Plaintiff's examinations were essentially normal and that most of her complaints were subjective.  See id. at 1381, 1384, 1385.

Aetna assigned Plaintiff's claim to a nurse case manager ("NCM") and involved its behavioral health unit ("BHU") in the review of Plaintiff's claim, as Plaintiff's medical records indicated a history of anxiety and depression.  Id. at 7, 13, 16.  The BHU determined that Plaintiff's primary complaints appeared to be "medical in nature with secondary anxiety because of the medical complaints," and so it would be more appropriate to consult with a medical doctor to determine the effect of Plaintiff's medical condition on her ability to work.  Id. at 29.

Consistent with this recommendation, Aetna referred Plaintiff's records to two medical doctors, Dr. Weinstein, whose specialty is internal medicine, and Dr. Blumberg, an orthopedic specialist, for a peer review.  After reviewing the medical records, Drs. Weinstein and Blumberg both concluded that the information in Plaintiff's medical records did not support a claim for disability benefits past April 19, 2009.  Id. at 40.

By letter dated April 17, 2009, Aetna informed Plaintiff that her STD benefits would terminate as of April 20, 2009 because Aetna, as the claims administrator, had determined that the medical information submitted and reviewed "did not present objective medical reasons why [Plaintiff] could not perform [her] job."  Id. at 655-56.  The letter also informed Plaintiff of her right to appeal and listed specific information that Plaintiff might submit in support of her appeal.  Id. at 655.

Thereafter, Plaintiff submitted a letter from her attorney dated May 29, 2009 notifying Aetna of her intent to appeal Aetna's decision.  Id. at 147-48.  Aetna contacted Plaintiff via telephone to explain the appeal process.  Id. at 45-47.  Aetna also sent letters to Plaintiff and her lawyer confirming receipt of her appeal.  Id. at 657; 661-62.

Plaintiff submitted two letters from herself (a typewritten letter and a handwritten letter); two letters (one handwritten and one typewritten) from her treating physician, Dr. Kelley, dated April 7, 2009 and April 27, 2009; and a letter from Dr. Dilaveri, dated April 21, 2009, in support of her appeal.  Plaintiff's typewritten letter recounted her history of complaints of pain and fatigue and stated that approximately three years ago she took "another job position that was easier on [her] and less stress [where she] wouldn't be on [her] feet as much or required to meet as many deadlines, and wouldn't have the responsibility of associates under [her]."  Id. at 142.  Plaintiff also stated that her boss was laid off approximately one year ago, and that her new

manager "required [her] to be at work and working."  Id.  Plaintiff claimed that issues with family and work and "finding out there [were] going to be layoffs and the banking industry having the problems they were" increased her stress and made her problems worse such that she did not believe she could continue working.  Id. at 143-44.

Dr. Kelley's April 27, 2009 letter listed Plaintiff's diagnoses and stated that Plaintiff "has been rendered unable to perform her job requirements" and is incapable of performing sedentary work.  Id. at 146.  Dr. Kelley did not specifically state, however, what medical conditions, restrictions or limitation she believed prevented Plaintiff from performing her job.  In her April 7, 2009 letter, Dr. Kelley invited Aetna to call her to discuss Plaintiff's condition.  Dr. Dilaveri of the Mayo Clinic also submitted a letter in which she opined that Plaintiff "has been unable to meaningfully participate in work activities" due to her reported pain and fatigue.  Id. at 149.

In light of Plaintiff's statement that she had changed jobs, Aetna asked Bank of America to provide Plaintiff's most current job description.  The job description stated that "[t]he primary role of the Wealth Management Banker is to provide deposit and credit expertise and advice to affluent clients in support of the Financial Advisor and client relationship."  Id. at 52, 53.

Plaintiff also submitted additional medical records in support of her appeal.  Although the documentation submitted by Plaintiff indicated frequent subjective reports of pain by Plaintiff, there were some inconsistencies in what Plaintiff reported to her doctors.  For example, on July 2, 2008, Dr. Patel noted that the Plaintiff "[d]enies fever, fatigue … sexual problems … headache … chest pain, abnormal heartbeats … heart murmurs… lupus … rash … easy bruising." Id. at 170.  Contrary to what she told Dr. Patel, Plaintiff told Dr. Dilaveri at the Mayo Clinic on March 4, 2009 that she "does get a lot of heart palpitations" "does get lots of headaches" has "easy bruising" and that it "hurts when she has intercourse[.]"  Id. at 172-74.  Dr.

Patel's July 2, 2008 OVN also states that Plaintiff "is under a lot of stress due to all of her symptoms, as well as minimal support given by her husband." Id. at 170.  Dr. Dilaveri's March 4, 2009 OVN states, however, that Plaintiff's "husband does a lot of the work around the house." Id. at 173.  While Plaintiff was at the Mayo Clinic, she was involved in a minor motor vehicle accident.  The notes from the emergency room state that "[a]ir bags did not go off …. The vehicle was apparently only traveling about 10 MPH …" Id. at 201 (emphasis added).  When Plaintiff returned and saw Dr. Patel, however, she reported that during her visit to the Mayo Clinic, "she was involved in a high-velocity motor vehicle accident which has significantly aggravated her lumbar symptoms …" Id. at 203 (emphasis added).  Plaintiff also reported to Dr. Patel that she was diagnosed with lupus at the Mayo Clinic.  (See id.)  However, Dr. Dilaveri's notes from her final consultation with Plaintiff state, "[W]e have discussed that she does have the history of lupus but at this time we can not (sic) say that she has active lupus or a flare of lupus …" Id. at 205.

Plaintiff's medical records also revealed that the majority of objective testing performed on Plaintiff resulted in normal or negative test results, although she had subjective complaints of pain.  The one test that was consistently positive consisted of Plaintiff's reporting that "trigger points" for fibromyalgia were tender when pressed by the physician.

The medical records also included a psychiatric analysis of Plaintiff performed by Dr. Gabrielle Melin, MD at the Mayo Clinic.  The evaluation revealed that Plaintiff's reported pain symptoms appear to coincide with personal issues she experienced several years ago.  See id. at 189.  Dr. Melin concluded that "there are many underlying issues that are coming out in her chronic pain …. Again, I think that medication should be part of her treatment plan but that

intensive one-on-one therapy including cognitive behavioral therapy will be extremely important." Id. at 192.

After receiving and reviewing these materials, Aetna caused all of Plaintiff's medical records and her appeal letters to be reviewed by four independent physicians and one independent clinical psychologist.

Dr. Tamara Bowman, who specializes in Internal Medicine, consulted telephonically with Plaintiff's treating doctor, Dr. Kelley, and performed a lengthy review and analysis of Plaintiff's medical records and reported symptoms. Id. at 93-102. Dr. Bowman noted that Plaintiff's clinical findings were largely normal and that the most significant findings were tender points and reported pain related to her diagnosis of fibromyalgia. Based on her review of the medical information, Dr. Bowman found no clinical support for disability on the basis of irritable bowel syndrome, gastrointestinal reflux disease, restless legs syndrome, renal stones, headaches, past elevated liver enzymes, or dizziness/tinnitus. Id. at 101. She deferred to her peers specializing in rheumatology, physical rehabilitation, occupational medicine and psychology regarding any limitations due to chronic pain, fibromyalgia or depression. Id. at 100, 102.

Dr. Michael Sukoff, Board Certified in Neurological Surgery and specializing in Physical Rehabilitation, also reviewed Plaintiff's medical records and prepared a report for Aetna. Id. at 104-09. Dr. Sukoff acknowledged Plaintiff's reports of pain and fatigue but noted that nearly all of the tests performed on Plaintiff were normal, and determined that she had not experienced a recent change in condition that would affect her functionality. In particular, Dr. Sukoff noted that "[p]hysical examinations have shown that the claimant has been neurologically intact. She has been noted to have normal strength, normal range of motion of the limbs and normal gait." Id. at 108. He also noted that her mental status examinations were normal, and that "there have

been no indications that the claimant has not been independent with her activities of daily living or mobility, including community mobility." Id. Dr. Sukoff also opined that the restrictions and limitations reported by her treating physicians were not appropriate because a person with somatic disorder such as fibromyalgia should be encouraged to engage in functional activities as part of her treatment plan. Id. at 109. Based upon his analysis of all of the medical information, Dr. Sukoff concluded that the information failed to support Plaintiff's claim of functional impairment. Id. at 108.

Plaintiff's records were also reviewed by Dr. Timothy Craven, who specializes in Occupational Medicine. Id. at 111-17. After a thorough analysis of Plaintiff's medical records, Dr. Craven concluded that Plaintiff "has documented medical problems but they should not preclude her from being able to perform the duties of her own occupation as an investment banker." Id. at 116. He also noted that there was no evidence that Plaintiff was experiencing adverse side effects from her medications, and that, based upon his "review of the extensive medical records, the restrictions and/or limitations outlined by her treating providers are not appropriate for her medical conditions." Id.

Dr. Mark Burns, who is Board Certified in Internal Medicine with a Specialty Certificate in Rheumatology, also performed an extensive review of Plaintiff's medical records. Id. at 119-123. Dr. Burns acknowledged that Plaintiff "has a diagnosis of fibromyalgia since at least 2005" and that she "has chronic diffuse pain" and "complains of insomnia and fatigue." Id. at 121. He concluded, however, that the "available physical findings would not support impairment from a light occupation." Id. at 122.

Psychologist Elana Mendelssohn also analyzed Plaintiff's records and prepared a report. Id. at 125-131. Dr. Mendelssohn noted that Plaintiff has "a history of depression and anxiety

dating back to at least 2003." Id. at 127.  She also noted that while the reports from the Mayo Clinic reflected opinions that Plaintiff was unable to work due to pain and fatigue (conditions that were evaluated by the other reviewing physicians),  "[t]here was no indication that she was unable to work secondary to deficits in emotional or cognitive functioning." Id. at 130.  Based upon her review of the record, Dr. Mendelssohn concluded that, regarding psychological impairment, "the information does not support the presence of a functional impairment from 4/20/09 through present." Id.

After completing its evaluation of Plaintiff's medical records and receiving and analyzing the reports of the independent physicians and psychologist, Aetna upheld its denial of Plaintiff's claim by letter dated July 24, 2009. Id. at 88-92.  In its letter, Aetna informed Plaintiff that "all of the medical information provided [dating as far back as 1999] was considered[,]" and summarized the information that "pertain[ed] to her most recent absence from work as of 3/3/09." Id. at 90.  Aetna acknowledged that "the records [that had been] provided document that your client has fibromyalgia, chronic fatigue syndrome and depression.  The records also indicate that she was diagnosed with lupus in the past; however, currently she is in remission." Id.  Aetna explained, however, that these diagnoses alone did not mean that Plaintiff was eligible to receive STD benefits because there was "a lack of medical evidence to support a functional impairment that would prevent [Plaintiff] from performing the essential functions of her occupation as of 4/20/09." Id.  Aetna further explained:

> There are no significant physical exam findings except for the finding of fibromyalgia with positive trigger points on exam.  X-rays performed [do] not show any significant disease of her spine.  There is no indication that your client has not been independent with her activities of daily living or mobility.  There is no evidence that the motor vehicle accident which occurred on 3/11/09 resulted in a functionally significant injury or impairment.  In fact the

neurological examination performed on 3/11/09 was completely normal.

Id. Aetna informed Plaintiff that she had exhausted her administrative appeals regarding her STD claim and notified her of her rights under ERISA. Following the denial of her appeal, Plaintiff contacted Aetna. An Aetna representative walked through the denial with Plaintiff and assisted her with her questions about applying for LTD benefits. Id. at 74.

### 4. Plaintiff's Claim for Benefits Under the LTD Policy

Following the denial of her STD claim, Plaintiff requested benefits under the LTD Policy. See id. at 77. Aetna denied Plaintiff's claim for LTD benefits by letter dated September 9, 2009 on the basis that her STD claim was denied effective April 20, 2009, prior to the time such benefits would have been exhausted, and thus she did not satisfy the elimination period for LTD benefits. Id. at 1396-97. In the letter, Aetna quoted the applicable provisions of the LTD Policy and informed Plaintiff of her right to appeal. Plaintiff did not submit an administrative appeal of the denial of her LTD claim.

### B. Procedural History

Plaintiff chose to pursue litigation by filing a Complaint against Aetna and the Plan on September 14, 2009, a few days following the denial of her LTD claim.[9] The case was fully briefed pursuant to an ERISA schedule.[10]

---

[9] Docket No. 2.

[10] See Docket Nos. 15, 41, 42, 45, 46, 47.

**DISCUSSION**

A.     **Standard of Review**

Here, it is undisputed that the language of the plan gives Aetna discretionary authority to determine eligibility for benefits and to construe the terms of the plan.[11]  The law is clear on this point: "If the plan grants discretionary authority to the administrator or fiduciary, the exercise of that authority will be set aside only if it is arbitrary or capricious."[12]  Under the arbitrary and capricious standard, the Court's inquiry is limited to determining whether Aetna's review of, and decision on, Plaintiff's claims was "sufficiently supported by facts within [its] knowledge to counter a claim that it was arbitrary or capricious."  [13]  So long as the administrative decision is supported by "substantial evidence," which means "more than a scintilla but less than a preponderance," the decision will not be disturbed.[14]  The Court will not substitute its own judgment for Aetna's unless Aetna's actions are without any reasonable basis.[15]

Plaintiff contends that an inherent conflict of interest on the part of Aetna dictates less deferential review.[16]  The Court rejects this proposition for two reasons.  First, Aetna served only as the claims administrator for the self-funded STD plan, and there is no evidence to suggest that Aetna had any financial or other incentive to deny a claim.  Accordingly, the "pure" arbitrary and

---

[11]   Aetna/Nelson 1553.  Plaintiff concedes this in her Response Brief.  Docket No. 46 at 4.

[12]   Nance v. Sun Life Assurance Co. of Canada, 294 F.3d 1263, 1267-68 (10th Cir. 2002) (citing Chambers v. Family Health Plan Corp., 100 F.3d 818, 825 (10th Cir. 1996)).

[13]   Nance, 294 F.3d at 1269 (quoting Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999)).

[14]   Sandoval v. MetLife Life & Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992)

[15]   Geddes v. United Staffing Alliance Employee Med. Plan, 469 F.3d 919, 929 (10th Cir. 2006) (internal citations omitted).

[16]   See Docket No. 46 at 11.

capricious standard applies to Aetna's decision on that claim.  Second, with regard to Plaintiff's LTD claim, where Aetna was both the claims administrator and the insurer of benefits, the Tenth Circuit law has held that conflicts do not necessitate a change in the standard of review.[17] Rather, the existence of a conflict is merely a factor the Court will weigh in its analysis.[18]

### B.    Aetna's Review of Plaintiff's Claims

#### 1.    The STD Claim Decision

The Court finds that Aetna's decision to deny Plaintiff's claim for STD benefits after April 20, 2009 was grounded upon a reasonable basis and supported by substantial evidence and so must be upheld, as discussed below.

Aetna initially approved Plaintiff's claim for STD benefits based upon her statements that she could not work due to pain and fatigue, and the information provided by her doctor, which indicated that Plaintiff was unable to work but expected to return to work by April 20, 2009.[19] At the time of its initial approval of the claim, Aetna requested and received additional medical information from Plaintiff, including the comprehensive notes from Plaintiff's visit to the Mayo Clinic.  Aetna assigned Plaintiff's claim to a nurse case manager and also involved its Behavioral Health Unit, indicating Aetna's intent to ensure that Plaintiff's reported psychological issues, as

---

[17]   Weber v. GE Group Life Assurance Co., 541 F.3d 1002, 1010-11 (10th Cir. 2008) (affirming that, in evaluating a claim in which a conflict is present, the Court "will still employ the arbitrary and capricious standard, but will weigh [a] conflict of interest as a factor in determining the lawfulness of the benefits denial").

[18]   See id.

[19] An initial payment of benefits is an indication of good faith.  See, e.g., Ellis v. Liberty Life Assur. Co. of Boston, 394 F. 3d 262, 272 n.23 (5th Cir. 2004) ("Although Ellis may urge that Liberty made its decision in bad faith, the fact that Liberty initially granted her LTD benefits under the Policy supports a finding of good faith on Liberty's part.").

well as her physical issues, were appropriately considered.   The record shows that before denying Plaintiff's claim, Aetna "diligently endeavored to discover the nature of [Plaintiff's] ailments," which the Tenth Circuit has found is evidence that a claims administrator did not abuse its discretion in denying a claim.[20]

The medical information Aetna received revealed that most of the objective tests performed on Plaintiff reflected normal results.   Aetna also caused Plaintiff's records to be reviewed by two qualified physicians who, while acknowledging Plaintiff's diagnoses and complaints of pain, concluded that the medical information did not support a finding that Plaintiff was unable to perform her job due to a medical condition.   Based upon its review of the medical records and other documents submitted and the physician evaluations, Aetna determined that, while Plaintiff had a history of pain and a diagnosis of fibromyalgia, the medical information did not support the imposition of restrictions or limitations that would prevent Plaintiff from performing her job.   After reviewing the record of Aetna's evaluation, the Court cannot say that Aetna's initial decision was without any reasonable basis.

And, when Plaintiff appealed Aetna's initial decision on her STD claim, Aetna did not simply look at the existing record in order to decide the appeal.   Instead, Aetna undertook an extensive review, including causing Plaintiff's medical records to be analyzed by five independent doctors (including one clinical psychologist), one of whom consulted with Plaintiff's primary care physician.   These five independent consultants each concluded that Plaintiff's conditions would not preclude her from performing the essential function of her job. Each of the consultants acknowledged Plaintiff's diagnoses and reported pain.   However, after

---

[20] Holcomb, 578 F.3d at 1193.

reviewing her medical records, which included comprehensive medical histories, hundreds of pages of office visit notes from numerous physicians and a multitude of test results, the independent consultants disagreed with the conclusions of Plaintiff's treating physicians about Plaintiff's limitations and restrictions, and found that Plaintiff's medical conditions would not prevent her from working at her job.

The Court finds that, in light of the extensive review it performed, Aetna did not act unreasonably in accepting the opinions of these five independent consultants that Plaintiff's claim of disability was not supported, even though the independent consultants may not have agreed with Plaintiff's treating physicians.[21]

Citing Brown v. Barnhart, 2006 WL 1431446 (10th Cir. May 25, 2006), Plaintiff argues that the fact that Aetna gave more weight to the opinions of the independent doctors who reviewed Plaintiff's medical records than it gave to the opinions of Plaintiff's treating physicians means that Aetna's claims decisions were arbitrary and capricious.  The Court finds that Plaintiff's reliance on Brown, a case involving an appeal of a denial of social security disability benefits, is misplaced for several reasons.  First, the holding in Brown was that the ALJ had erroneously applied a social security regulation regarding the length of time an impairment must have lasted before it can be considered as a "potential severe impairment" for purposes of

---

[21] See Chalker v. Raytheon Co., 291 Fed. Appx. 138, 144-45 (10th Cir. Aug. 19, 2008) (holding that "it was not arbitrary and capricious for [the claims administrator] to credit the reports of the two [independent physician consultants] rather than the reports of [the treating physicians]" in denying the plaintiff's disability claim) (citing Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

awarding social security disability benefits.[22]   Because this case does not involve a claim for social security benefits, the holding in Brown is inapplicable here.[23]

Second, Plaintiff overstates the implication in Brown regarding the nature of fibromyalgia in the disability context.  The court in Brown did not, as Plaintiff suggests, find that fibromyalgia is per se a disabling condition.  Rather, the court observed that an administrative fact-finder could potentially find that the severity of the fibromyalgia suffered by the particular plaintiff in question was a "severe medical impairment" under the social security regulations and that the subjective nature of the condition "does not exclude it from coverage per se."[24]   These findings are far more limited than Plaintiff suggests, and do not support the conclusion that Aetna's determination that Plaintiff was not disabled was arbitrary and capricious.  Aetna did not base its decision on a conclusion that fibromyalgia could never be disabling, nor did it reject Plaintiff's claim solely on the basis that her condition was diagnosed primarily through subjective reporting of symptoms.  Rather, considering all of the evidence in Plaintiff's extensive medical records and the opinions of the five independent experts who also examined those records and acknowledged Plaintiff's diagnosis of fibromyalgia, Aetna determined that Plaintiff was not precluded from performing her sedentary to light duty occupation.

Moreover, the court in Brown relied extensively on another case involving a denial of social security disability benefits, Green-Younger v. Barnhart, 335 F.3d 99 (2d Cir. 2003), in determining that the court erred in finding that Plaintiff's fibromyalgia could not be considered a

---

[22] See Brown, 2006 WL 1431446.

[23] See Surett v. Cent. & S.W. Corp., 2006 WL 2850316 at *5 (N.D. Okla. Sept. 29, 2006) (holding that "[t]he determination of disability under the Social Security regime cannot be equated with the determination of disability under the ERISA regime").

[24] Id.

disabling condition.  The Second Circuit in Green-Younger, in turn, based its finding upon the trial court's failure to follow the social security law "treating physician rule."  It is well established, however, that the "treating physician rule" that applies in social security disability cases such as Brown and Green-Younger is inapplicable in cases arising under ERISA.

In Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003), the Supreme Court held that in ERISA disability cases "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."[25]  That is precisely what Plaintiff is urging the Court to do here—impose a discrete burden of explanation on Aetna because it credited the opinions of the independent experts who evaluated Plaintiff's medical records over those of two of Plaintiff's treating physicians.  Black & Decker makes clear, however, that the course that Plaintiff is urging the Court to take is impermissible.  The Court finds that, while the independent reviewing doctors reached different conclusions than Plaintiff's treating doctors, their findings were nevertheless reliable, and it was not unreasonable for Aetna to rely upon their evaluations in making its decision.  Plaintiff's arguments in this regard are therefore rejected.[26]

Plaintiff also argues that the fact that Aetna did not obtain an independent examination of Plaintiff renders its denial of continuing disability benefits arbitrary and capricious.  While such

_____

[25] Id.; see also Leahy v. Raytheon Co., 315 F.3d 11 (1st Cir. 2002) (existence of conflict between treating physician and independent reviewers insufficient to meet plaintiff's burden under arbitrary and capricious standard of review).

[26] See Chalker, 291 Fed. Appx. at 144-45; Meraou v. Williams Co. Long Term Disability Plan, 221 Fed. Appx. 696, 702-703 (10th Cir. Feb. 9, 2007) (holding that it was not improper for the claim administrator to credit the opinions of five reviewing physicians over the opinions of the plaintiff's treating doctor regarding her ability to work).

exams might be preferable in some cases, they are not required, however.[27]   The Court cannot

say that Aetna's decision to forego an independent examination in this case was unreasonable,

especially where the medical record is so detailed and includes exhaustive reports by other

doctors, including extensive reports of evaluations done by the Mayo Clinic close in time to

Plaintiff's claimed disability.   In addition, as noted above, reviewing physician Dr. Bowman

consulted with Plaintiff's primary care doctor.   With such comprehensive medical records

available for review, it was not unreasonable for Aetna to rely on the independent specialists'

analyses of the medical records rather than requiring Plaintiff to undergo an independent exam

(or potentially a series of independent exams, given the multiple specialties of the reviewing

doctors who reviewed Plaintiff's medical records), and Aetna's decision to rely upon the

independent experts' reports does not constitute a "serious procedural irregularity" under ERISA

as Plaintiff contends.

Plaintiff also asserts that Aetna acted arbitrarily and capriciously because it did not defer

a decision on her claim until the Social Security Administration issued its determination on

Plaintiff's claim for social security benefits.   The Court finds that Plaintiff's argument is both

factually and legally infirm and cannot serve to render Aetna's decision arbitrary and capricious.

As an initial matter, there was no determination as to Plaintiff's social security disability

claim when Aetna, by letter of September 9, 2009, denied Plaintiff's LTD claim and advised her

of her appeal rights.   Instead of initiating an appeal, Plaintiff brought this litigation a few days

later, on September 14, 2009.   Before filing the lawsuit, Plaintiff did not request that Aetna defer

---

[27] See, e.g., Smith v. Metropolitan Life Ins. Co., 344 F. Supp. 2d 696, 703 (D. Colo. 2004) (holding that "[u]nder Fought[v. Unum Life Ins. Co. of Am., 379 F.3d 997, 1015 (10th Cir. 2004)] … independent physical exams are not required[,]" and finding that causing two reviews of Plaintiff's medical records to be performed was sufficient.).

any decision on her claim until after the Social Security Administration had made a decision on that claim.  Moreover, there is no evidence that Aetna would not have considered a favorable social security determination along with all of the other evidence in the record, had a social security determination been submitted (although by no means would Aetna have been bound by such a decision). [28]  But, again, Plaintiff did not submit a social security decision or request that Aetna wait to decide her claim until the Social Security Administration acted.

Also, ERISA imposes time limits on claim administrators to decide claims for benefits.  Aetna appropriately decided Plaintiff's claim within those time limits.  In addition, Plaintiff's argument is based upon the erroneous supposition that Aetna somehow knew in advance that the Social Security Administration would issue a favorable determination to Plaintiff.  Obviously, Aetna could not predict that the Social Security Administration would grant benefits – it was just as likely that Plaintiff's claim for social security benefits would be denied.

Beyond that, Aetna cannot be faulted for failing to consider a social security award that was not in existence at the time it made its decision.  Nor was Aetna's failure to consider the Social Security Administration's decision over one year after the administrative record had been closed arbitrary or capricious.  It is well established that, "[i]n determining whether the plan administrator's decision was arbitrary and capricious, the district court generally may consider only the arguments and evidence before the administrator at the time it made that decision."[29]  In Murphy v. Deloitte & Touche Group Ins. Plan, 619 F.3d 1151 (10th Cir. 2010), the Tenth Circuit

---

[28] See Black & Decker, 538 U.S. at 832 (holding that it is well-established that "[t]he determination of disability under the Social Security regime cannot be equated with the determination of disability under the ERISA regime" and thus ERISA claim administrators are not bound by the decisions of the social security administration).

[29] Sandoval, 967 F.2d at 380.

strongly reaffirmed this longstanding principle.   In *Murphy*, the Court stated, "[W]e have frequently, consistently, and unequivocally reiterated that, 'in reviewing a plan administrator's decision under the arbitrary and capricious standard, the federal courts are limited to the administrative record.' [citations omitted]."  *Murphy*, 619 F.3d at 1157.  The Court in *Murphy* also reiterated ERISA's specific policy goals that compel this result, stating that, "[b]oth a plan participant and an administrator have a fair opportunity to include in the record materials related to the participant's eligibility for benefits.  Because the administrator must base its decision on the materials included in the administrative record, a district court would have no justification for concluding that an administrator abused its discretion by failing to consider materials never submitted to it for inclusion in the administrative record."  *Id*. at 1159.  Again, the social security decision was not entered until well after the administrative record was closed.  Plaintiff sought to include it as part of her reply brief, over one year after the administrative record had closed.[30]

The Court also rejects Plaintiff's argument that the Supreme Court's reasoning in Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343 (2008), renders Aetna's decision arbitrary and capricious.   In Glenn, the Court observed that the record contained significant evidence of a conflict of interest on the part of the claims administrator, MetLife, that could support a decision that its claim decision was arbitrary and capricious.  Among other things, MetLife failed to provide the independent experts who were reviewing the plaintiff's claim with all of the relevant medical evidence. Also, MetLife encouraged the plaintiff to apply for social security benefits and financially benefitted in the form of an offset to benefits paid

---

[30] Plaintiff's Reply was stricken from the record after Aetna filed its Motion to Strike (Docket No. 50) and Plaintiff failed to respond to that motion.  See Docket No. 51.

when the plaintiff received social security benefits, but then completely ignored the social security administration's finding that the plaintiff was disabled.

None of these factors is present here. First, the Court finds no support in the record for Plaintiff's allegation that Aetna failed to provide the independent doctors with all of the relevant medical evidence. To the contrary, the record reflects that the experts were provided with, and fully considered, the extensive medical records Plaintiff provided to Aetna. Second, Aetna did not on the one hand encourage Plaintiff to apply for social security benefits yet on the other hand seek to offset such benefits against disability benefits made by Aetna (since no social security award had been entered at the time), and Aetna thus did not "benefit financially" from Plaintiff's applying for social security. Also, because no decision by the social security administration had been issued when Aetna was considering Plaintiff's claim, Aetna could not have ignored such a decision. None of the Glenn factors would apply here to support Plaintiff's allegation that Aetna's decision was arbitrary and capricious.

In adjudicating Plaintiff's claim for STD benefits, Aetna gathered and reviewed extensive medical records. When Plaintiff appealed the denial of her claim, Aetna caused her records to be reviewed by five independent medical practitioners, all of whom concluded that the medical information failed to show that Plaintiff could not perform her light duty occupation. The Court cannot substitute its own judgment for Aetna's unless Aetna's actions are without any reasonable basis.[31] As explained above, the Court finds that Aetna had a reasonable basis for denying Plaintiff's STD claim as of April 20, 2009 and so Aetna's decision was not arbitrary and capricious.

---

[31] Geddes, 469 F.3d at 929 (internal citations omitted).

2.      The LTD Claim Decision

The LTD Policy provides that to be eligible to receive LTD benefits, Plaintiff must satisfy an elimination period, meaning she must have been continuously totally disabled for a period that was the greater of "180 days of a period of disability" or the expiration of STD benefits.  Here, Plaintiff's STD benefits were terminated prior to the expiration of STD benefits or 180 days because Aetna determined that the evidence did not establish total disability.  Therefore, Plaintiff did not satisfy the elimination period.  The Court therefore finds that Aetna did not act arbitrarily or capriciously in denying Plaintiff's LTD claim.[32]

## CONCLUSION

For the reasons cited herein, Defendant Aetna's decisions on Plaintiff's claims for disability benefits under the Plan is hereby AFFIRMED.  A separate Judgment in favor of Aetna Life Insurance Company and the Bank of America Group Benefits Program is filed herewith.

**IT IS SO ORDERED** this 20th  day of May, 2013.

James H. Payne
United States District Judge
Northern District of Oklahoma

---

[32] In making this decision, the Court has taken into account the fact that Aetna was both the claims administrator and the insurer of the LTD Policy.

23